UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHELDON H. SOLOW,<br><br>                              Plaintiff,<br><br>-v-<br><br>CONSECO, INC. and CARMEL FIFTH, LLC,<br><br>                         Defendants. | No. 06 CV 5988 (BSJ) (TK)<br><br>ECF Case |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY KIRKLAND & ELLIS LLP AS ATTORNEYS FOR DEFENDANTS

Plaintiff Sheldon H. Solow ("Solow" or "Plaintiff"), by and through his undersigned counsel, seeks to disqualify Kirkland & Ellis LLP ("Kirkland") as attorneys for Conseco, Inc. ("Conseco") and Carmel Fifth, LLC (collectively "Defendants"), and states as follows:

## PRELIMINARY STATEMENT

Kirkland, counsel for Defendants, is enmeshed in a fundamental and irreparable conflict of interest with its client. Because of Kirkland's unusual involvement with respect to the transaction underlying this case and its conflicting representations of fact to judicial tribunals, it has placed itself in a position where it will necessarily be made an adverse witness (and possibly a co-defendant) to its own client. In particular:

- In a memorandum improperly withheld in a September 2003 Delaware litigation involving the sale of the GM Building (the "Building"), Kirkland acknowledged that the sale of the Building would be an "auction," directly contradicting the most critical representations made by Defendants and Kirkland in that litigation and in this case.

- Kirkland was aware that Defendants' agent for the sale of the Building had originally intended to use a "stalking horse" bidder, contrary to Defendants' assertion that there is no basis for Plaintiff's claim that a "stalking horse" was used to help set the price for the Building.

- Kirkland filed documents in the bankruptcy court in the Northern District of Illinois that conflict with Defendants' repeated claims that the Building was sold outside of the bankruptcy process.

- Kirkland apparently required Defendants to retain them in future litigation arising out of the sale of the Building, allowing it to maintain control of such litigation and insulate itself from liability.

Almost as troubling as Kirkland's substantive conflicts of interest with its client, is the manner in which these irremediable conflicts have come to light. For a period of five months, Defendants repeatedly attempted to obstruct discovery, thus concealing facts demonstrating its conflicted position in this case. Ultimately, Plaintiff had to seek and obtain a court order to compel production. The documents finally obtained through the court order demonstrate conclusively Kirkland's conflicted position and prompted the timing of this motion.[1]

---

[1] Among the documents recently obtained in discovery are: a memorandum from a Kirkland attorney acknowledging (contrary to Defendants' position) that the sale of the GM Building was an auction (*See* Declaration of Jason M. Koral, dated March 9, 2007 ("Koral Dec.") Exhibit ("Ex.") A); a memorandum from Defendants' selling agent to a Kirkland attorney setting out its plan to use a stalking horse bidder (contrary to Defendants' suggestion that no such plan was ever contemplated) (Koral Dec. Ex. B); emails involving Kirkland attorneys discussing the need to have the sale of the Building conducted pursuant to the Bankruptcy Plan in order to save on the substantial transfer tax liability (contrary to repeated representations in this litigation that the sale had nothing to do with the bankruptcy proceeding) (Koral Dec. Ex. C); a draft indemnity agreement where a Kirkland attorney appears to have appended handwritten notes anticipating this litigation and requiring Kirkland's retention (Koral Dec. Ex. D); and numerous other

Accordingly, in the interest of justice and pursuant to the disciplinary rules of the State of New York, we respectfully request that Kirkland be disqualified as attorneys for Defendants.

## STATEMENT OF FACTS

**A.**     <u>**The Present Lawsuit**</u>

*1.     The Auction*

Plaintiff's complaint relates to the fraudulent auction of the General Motors Building, at 767 Fifth Avenue, in New York City (the "GM Building" or the "Building"). In 2003, the Building was the most significant asset controlled by the then-bankrupt estate of Conseco, and its disposition was therefore essential to the ultimate success of Conseco's reorganization plan.[2] However, Conseco's control and ownership of the Building was contested by its manager, Donald Trump ("Trump"). As part of its dispute with Trump, Conseco initially sought to have the Building sold through a sale conducted pursuant to Section 363 of the Bankruptcy Code (the "Section 363 sale"). In making its application to the Bankruptcy Court, Conseco insisted that in its business judgment, an auction of the Building was in the best interest of stakeholders, and therefore disclosed its intent to sell the Building via an auction, following certain rules and procedures.

Eventually, Conseco settled with Trump and withdrew its application to conduct a Section 363 sale. Instead, using the same selling agent it had retained in connection with the proposed Section 363 sale, Conseco represented to all interested parties that it would conduct its own auction of the Building, using rules and procedures similar to those initially proposed to the

documents illustrating Kirkland's leading role in the transaction,     **REDACTED**

[2]     Conseco filed its petition for relief pursuant to Chapter 11 of the Bankruptcy Code on December 17, 2002, in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court").

Bankruptcy Court in the more informal setting of a private, but open, trade auction. For example, Conseco's auction rules provided (among other things) that: (a) final round bids had to be submitted on August 27, before 5:00 p.m.; (b) the August 27 bids would be the final round of bidding; (c) bids had to be submitted in sealed envelopes to be opened by Defendants and their agents, outside of the presence of potential purchasers; and (d) bids had to include certain elements, such as truthful representations about financing plans. The appearance of adhering to a fair auction procedure was essential in order that Conseco could appear to creditors to be acting consistent with its fiduciary duty to secure the best possible value for the sale of the Building.

Accepting Conseco's representations as to the bona fides of the proposed auction of the Building as true, Solow, acknowledged by the defendants as a reputable and well-financed player in the New York real estate market, invested significant time and effort in preparing an appropriate bid for the Building in full compliance with Conseco's auction rules. At the second and final round of bidding for the Building, Solow submitted the best, credible bid, outbidding Defendants' favored insider, Harry Macklowe ("Macklowe"), by some $35 million in the final auction round.

Macklowe, in sharp contrast, submitted a defective bid in violation of the form and content specified by Conseco. Instead of offering a fixed dollar amount, Macklowe's offer included a supplemental bid conditional on the amounts submitted by others, a bid in violation of Conseco's auction procedures and New York law. Macklowe's bid also falsely represented that its financing approvals had been secured even though Macklowe (and on information and belief, Conseco) knew that the approvals had not yet been obtained. This defective bid in hand, Macklowe calmly walked in after the bid deadline had passed, and was quickly ushered up into Conseco's offices where the sealed bids of other participants were being opened. Even worse,

4

because Macklowe's late, non-conforming bid still was insufficient to top Solow's $1.4 billion bid, Conseco, in blatant disregard of the procedures it had undertaken to follow in representations to Solow, to other bidders, and to the Bankruptcy Court, secretly allowed Macklowe (and Macklowe alone) to match Solow in an undisclosed transaction held the day after the auction was closed.   Finally, to conceal their violation of their own auction procedures and rules, Conseco issued misleading statements to the press and to Solow's attorney, falsely suggesting that Macklowe had secured the Building by submitting the best bid in the auction.

Thus, Conseco had no intention of conducting a fair auction as required under New York law.  Instead, it concocted a scheme to hand the Building to a favored, inside bidder, once its bogus auction process established a price to sell the Building.  As part of that plan, Solow was unwittingly used by the Defendants as an undisclosed and uncompensated "stalking horse," in order to help establish the price at which the Building would be sold the favored, pre-selected bidder.  When Solow presented the best bid in the final auction round,  Conseco simply threw out the auction results, and purported to hand the Building to Macklowe in a secret, backroom deal.

Plaintiff's complaint asserts, among other claims, causes of action for fraud, unjust enrichment, and the breach of the duty to hold a fair auction.  The breach of duty cause of action is based on the duty under New York law of a seller using an auction process, however formal or informal, to conduct the auction fairly pursuant to the rules and procedures the seller has established.

2.    *Conseco's Defenses*

Conseco's motion to dismiss the complaint raises various purported defenses.  Among other arguments, Conseco has contended that:

(a) The sale of the Building was not an auction required to be conducted fairly under New York law, and that because there was no auction, Conseco was under no duty to act fairly towards bidders and could do whatever it wished;

(b) There was no fraudulent scheme to dupe Solow into acting as an unwitting and uncompensated stalking horse bidder; and

(c) Solow could not reasonably rely, even in part, on the apparent conformity of the auction rules for the sale of the Building with the procedures of the proposed Section 363 sale, or on any of the statements made in connection with that proposed sale, because the sale was conducted entirely outside the bankruptcy process.

In reality, however, these defenses and arguments conflict with other statements made by Kirkland at other times and in other settings.

**B.**   **Kirkland's Role in the Sale and the Litigations**

*1.*   *Kirkland Develops the Initial Auction Proposal*

Kirkland's representation of Defendants began on or before 2003, shortly after Conseco filed for bankruptcy. Numerous documents submitted to the Bankruptcy Court by Kirkland on Defendants behalf, described the Building as a "critical" asset of the estate, the sale of which was "important to the success" of Debtors' plan of reorganization (the "Bankruptcy Plan"). *See* Koral Dec. Ex. F pp. 15-17; Ex. G p. 5. To achieve this end, Kirkland and Defendants applied to the Bankruptcy Court to conduct a Section 363 sale, seeking authority to sell the Building in an auction "for the best available price" pursuant to a submitted list of "Bid Procedures" that would govern the proposed auction. *See* Koral Dec. Ex. G. Defendants also submitted a motion requesting authority to appoint Eastdil Realty Company LLC ("Eastdil") as the agent to market and sell the Building. *See* Koral Dec. Ex. H.

*2.        Kirkland and Eastdil Decide to Use a Stalking Horse Bidder*

As part of the anticipated Section 363 sale, Eastdil determined to use a "stalking horse" bidder. *See* Koral Dec. Ex. B. Kirkland was well-aware of this plan, which was discussed in communications with Eastdil, and which does not appear to have been abandoned by Eastdil. *Id.*[3] Ordinarily, in the context of a Section 363 sale, a "stalking horse" bidder is an interested purchaser who is used to establish a minimum price for the asset to be sold. If a subsequent purchaser outbids the "stalking horse", the latter is entitled to compensation for its efforts. The identity and existence of the stalking horse bidder must be disclosed. However, in this case, after Conseco withdrew its application for a Section 363 sale, it made no attempt to notify potential bidders in its subsequent auction of its intentions to employ stalking horse bidders.

*3.        Kirkland Treats the Sale of the Building as Pursuant to the Bankruptcy Plan*

Ultimately, Conseco withdrew its application for a Section 363 sale. Having determined to sell the Building at an auction process, Conseco conducted an auction process that purported to be similar to that set forth in the application for the Section 363 sale.

Defendants have since claimed that the Building was not sold subject to the Bankruptcy Plan. For example, Defendants argued in their Reply Brief that Conseco's Chapter 11 Bankruptcy Court's proceedings are irrelevant to this case, and then insisted in a letter to the Court that the sale of the Building was not "a bankruptcy sale." *See* Koral Dec. Ex. I fn. 1, 3; Ex J p. 3. But Defendants' argument is contradicted by Kirkland's representations to the Bankruptcy Court, purportedly on Conseco's behalf. In the Conseco's Reorganizing Debtors' Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States

---

[3]        Exhibit B consists of a memorandum from Eastdil to a Kirkland attorney, recently obtained by Solow in discovery. The memo summarizes the stalking horse plan and includes a timeline for its implementation.

Bankruptcy Code (the "Plan," attached as Koral Dec. Ex. V), duly filed by Kirkland in September 2003 on behalf of Conseco -- less than two weeks after the actual auction of the GM Building that is the subject of this litigation, Conseco stated:

> *Specifically, because sale of the GM Building (or the entities owning the GM building or the interest therein), is being conducted pursuant to this Plan, any instrument of transfer that would effect transfer of the GM Building as proposed in pleadings filed in these Chapter 11 Cases may not be taxed under any law imposing a stamp tax or similar tax.* (Koral Dec. Ex. V pp. 54-55).

Thus, at the very time that Conseco contends that as a matter of law, it was not under any obligation to conduct a fair auction for the property and therefore was free to sell the Building in whatever manner it wished, Kirkland was filing papers on its behalf seeking the Bankruptcy Court's blessing of a tax exemption for the proceeds, which would only be available to a sale conducted pursuant to the court-supervised Plan.   In addition, Kirkland memoranda demonstrate that Kirkland's concern about the over $40 million transfer tax liability associated with the sale of the Building contributed to its decision to seek to have it be conducted pursuant to the Plan. *See* Koral Dec. Ex. C. [4]

    4.    *Kirkland's False Representations to the Delaware Chancery Court*

Shortly after the sale of the Building, Plaintiff filed a complaint in the Delaware Chancery Court seeking a preliminary injunction.  Defendants, once again represented by Kirkland, made repeated representations that the Building was not sold at an auction and counsel

---

[4] Solow was previously aware of the representations made in the Plan.  However, recently discovered documents, such as the emails listed in Exhibit C, demonstrate Kirkland's leading role in (and hence intimate knowledge of) the decision to seek to have the sale conducted pursuant to the Plan.

falsely represented to the court that no documents existed that had the word "auction" on them. Koral Dec. Ex. K p. 54.[5]

In fact, this statement was false because a Kirkland memorandum prior to the sale acknowledged that it would be conducted via an informal auction process. *See* Koral Dec. Ex. A p. 2. Yet neither the Plaintiff nor the Delaware Chancellor was able to discern the falsity of Kirkland's representation because the Kirkland memorandum, even though clearly responsive to document requests propounded in the Delaware litigation, was inexplicably and improperly withheld from production.[6] As a result, Chancellor Chandler, in part explicitly relying on the purported lack of any documents containing the word "auction," denied the preliminary injunction (even while preserving Plaintiff's right to seek damages or other relief upon a more complete record).[7] Koral Dec. Ex. L pp. 2-3.

After discovering additional facts and information, Plaintiff filed a complaint in this Court. Defendants then filed a motion to dismiss, which is now pending before the Court. In the briefs supporting their motion, Kirkland and Defendants have made repeated, misleading representations that an auction did not occur and have consistently relied on the ruling by

**REDACTED**

[6]     The Conseco document production also reveals other examples of documents improperly withheld during the Delaware litigation. For example, while Kirkland contended in Delaware that Conseco had questions about Solow's debt financing disclosures, Conseco inexplicably withheld documents demonstrating that Eastdil had already lined up off-the-shelf loan proposals for use by any buyer. See, e.g., Koral Dec. at Ex. E (loan term sheet proposal from Morgan Stanley Mortgage Capital, Inc. sent to Eastdil).

[7]     Although Chancellor Chandler denied Conseco's motion to dismiss, the Delaware Chancery Court action, in which Solow sought to enjoin the transfer of the Building, was dismissed without prejudice by stipulation of the parties, after the purported sale to Macklowe closed. Thus, Kirkland effectively "ran out the clock" on Solow, and thereby avoided having Solow discover that highly relevant documents had been improperly withheld.

9

Chancellor Chandler. *See* Koral Dec. Ex. M pp. 2-8; Ex. I p. 2. They have also claimed that any representations made to the Bankruptcy Court in connection with the sale of the Building are irrelevant. *See* Koral Dec. Ex. I fn. 1, 3.

5.      *Kirkland Seeks to Protect Itself From Potential Fallout from the Transaction*

On information and belief, following the sale of the Building, one or more Kirkland attorneys reviewed an indemnity agreement between Conseco and the title insurance company signed by Charles H. Cremens, authorized signatory of the Defendants, and wrote in an amendment requiring the retention of Kirkland for future litigation against Solow. Koral Dec. Ex. D. The effect of such a clause would be to ensure that in the event of litigation with Solow over the Building, Kirkland's retention would be guaranteed, and Kirkland would be in an ideal position to control the litigation and minimize its potential adverse impact on Kirkland as potential witness or even potential defendant.

6.      *Kirkland's Obstruction of Discovery*

In an apparent effort to prevent Plaintiff from discovering any documents that would reveal their conflicting statements (both in Delaware and New York), Kirkland has repeatedly attempted to obstruct the discovery process. On October 11, 2006, after multiple attempts to schedule a Rule 26(f) meet and confer with Kirkland, Plaintiff informed the Court that Kirkland refused to observe its obligations pursuant to Federal Rule of Civil Procedure 26. Koral Dec. Ex. N. Based on this submission, Magistrate Judge Katz set a pre-trial conference date. On November 10, 2006, five days prior to the scheduled pre-trial conference, Kirkland asked the Court to stay discovery pending the motion to dismiss. Koral Dec. Ex. O. At the pre-trial conference, after hearing argument from both parties, Magistrate Judge Katz set a discovery schedule, requiring all documents to be produced by January 15, 2007. Koral Dec. Ex. P.

Less than one month before the production deadline, using a state court opinion in another case involving Conseco as a pretext, Kirkland once again submitted a motion to the Court seeking to stay discovery until the motion to dismiss was decided.  Koral Dec. Ex. Q. As was the case in the earlier Delaware litigation, it appears that Kirkland's strategy was to "run out the clock" on Solow, attempting to dispose of the case before being forced to produce documents that contradicted representations made by Conseco.  However, after considering submissions by both parties, Magistrate Judge Katz once again denied Kirkland's request.  Koral Dec. Ex. R. One week after the passage of the deadline to produce documents, Defendants still were withholding documents, leaving Plaintiff with no choice but to seek and order from the Court to compel production.  Magistrate Judge Katz ordered Defendants to produce all hard copy documents by February 1, 2007 and all electronic documents by February 15, 2007.  Koral Dec. Ex. S.

Despite Defendants' vehement efforts to impede discovery, Plaintiff has now discovered information that clearly demonstrates the misleading nature of Kirkland's representations to the Bankruptcy Court, the Delaware Chancery Court, and now this Court.  These documents also demonstrate that Kirkland has undergone unusual efforts to maintain control of these litigations and protect itself from potential liability.

## ARGUMENT

### I.   Legal Standard

The disqualification of an attorney is a matter which rests within the sound discretion of the court.  *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72-73 (2d Cir. 1990); *Mondello v. Mondello*, 499 N.Y.S. 2d 9, 10 (2d Dep't 1986).  New York Disciplinary Rules 5-102(B) and (D), which govern the situation when a party must call opposing counsel as a witness, provide

that a lawyer may not accept or continue a representation on behalf of a client if the lawyer or another lawyer in the lawyer's firm "may be called as a witness on a significant issue other than on behalf of the client" and "it is apparent that the testimony would or might be prejudicial to the client."[8] *See also Brooks v. Bates*, 1994 U.S. Dist. LEXIS 4502, at *8-9 (S.D.N.Y. April 7, 1994) (finding likelihood that attorney may testify adversely to his client to be the "most compelling basis for disqualification").

The party seeking to disqualify pursuant to Rule 5-102(B) bears the burden of demonstrating that the testimony of the opposing attorney is (1) necessary and (2) likely to prejudice the client. *Cabble v. Rollieson*, 2006 U.S. Dist. LEXIS 7385, *11 (S.D.N.Y. Feb. 27, 2006). Courts consider a variety of factors in assessing the "necessity" of testimony, "including the significance of the matters as to which the attorney's testimony is sought, the weight of the testimony, and the availability of other evidence." *Id.* at *11-12. Testimony is prejudicial if it is "sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." *Occidental Homes Mgmt. B.V. v. Westbrook Allegro LLC*, 440 F. Supp. 2d 303, 314 (S.D.N.Y. 2006) (quoting *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)). Although decisions to disqualify are subject to strict scrutiny, the Second Circuit has made clear that "any doubt [of whether an attorney should be disqualified] is to be resolved in favor of disqualification." *Hull v. Celanese*, 513 F.2d 568, 571 (2d Cir. 1975); *see also* New York Code of Prof'l Responsibility EC 5-10 ("Where the question [of testimony versus representation]

---

[8] New York Lawyer's Code of Prof'l Responsibility DR 5-102(B)&(D) (22 NYCRR 1200.21[b][d]). Although the Second Circuit is not strictly bound by the New York Code of Professional Responsibility, it is clearly guided by it. *See Brooks*, 1994 U.S. Dist. LEXIS 4502, at *7. Moreover, the Local Rules of the Southern & Eastern Districts of New York require attorneys to comply with these standards of conduct. *See* Local Rule 1.5(b)(5).

arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate.")

## II.     The Testimony of Kirkland Attorneys is Necessary and Prejudicial to Defendants on at Least Four Issues

### A.     *Kirkland's Representations Concerning the Auction Process in the Delaware Court are Belied by Documents Improperly Withheld in that Litigation*

In oral argument in the Delaware Chancery Court, Reed Oslan, the principal Kirkland attorney appearing in that litigation and the partner responsible for this litigation, stated that "[t]he entirety of [Plaintiff's] claim turns on a singular allegation that the process here was an auction. Now, if there was an auction – if this was an auction, one would think that there would be a document that says the word 'auction.' *There is none.*" Koral Dec. Ex. K. p. 54 (emphasis added). Chancellor Chandler clearly relied on this alleged absence of documents using the term "auction" in his ruling. Koral Dec. Ex. L pp. 2-3. Defendants have repeatedly referenced Chancellor Chandler's ruling in its submissions to this Court. *See* Koral Dec. Ex. M pp. 4-5; Ex. I p. 2.

Unfortunately, Mr. Oslan's statement conflicts with a prior Kirkland memorandum acknowledging that the sale would be conducted in the form of an auction. The Kirkland memorandum, although responsive to Plaintiff's document requests in the Delaware litigation,[9] was not produced until this litigation, after several attempts by Kirkland to delay or impede production of documents. This memorandum, *drafted three months prior to the oral argument in Delaware*, states that "[t]he sale process will instead be conducted through and [sic] informal auction process." Koral Dec. Ex. A p. 2. Had Chancellor Chandler been aware of the existence of the Kirkland memorandum, he would not have relied on the alleged absence of documents

---

[9]     "All documents that refer or relate to the manner in which the Building was to be offered for sale. . ." Koral Dec. Ex. T p. 6.

using the term "auction" and those proceedings might have played out differently. Accordingly, Defendants' continuing citation to and reliance on the Chancellor's opinion, which was procured on the basis of an incomplete and misleading record, is inappropriate.

The Kirkland memorandum's reference to an "auction process" was no accident. The memorandum was sent to the Conseco Creditors Committee approximately two months after the withdrawal of the application for a Section 363 sale. By referring to the process by which the Building would be sold as an "auction," the Kirkland memorandum attempted to reassure Conseco's creditors that the Building would still be sold in a fair and open way that would maximize the potential return to the Conseco estate.

By the time the Delaware litigation with Solow took place in September 2003, however, Kirkland's contemporaneous admission of the existence of an auction was an enormous potential embarrassment to Conseco's contradictory position in that case (and in this one) – assumed solely for the purposes of litigation – that there was no auction. Accordingly, the memorandum was mysteriously withheld from production during discovery despite its obvious relevance. Its inexplicable absence conveniently allowed Kirkland to make its highly theatrical but fundamentally misleading representation to the Delaware Chancellor, in direct contradiction to its earlier reassurances to the Conseco creditors. Kirkland's attempt to speak out of both sides of its mouth and vary its message depending on the intended audience, has transformed it from legal counselor to an adverse witness against its client.

Plaintiff originally intended to depose the nine Kirkland attorneys named in its Rule 26(a)(1) disclosures to seek relevant information regarding the bankruptcy proceedings and

certain aspects of the transaction.[10]  However, it is now clear that their testimony is necessary not merely to obtain relevant information, but to disprove Defendants' central defense, and the basis for the motion to dismiss: that the Building was not sold in an auction.  Kirkland's expected testimony on this issue is clearly adverse and prejudicial to Defendants since it is an admission that Defendants intended to sell the Building pursuant to an auction, in contrast to Conseco's litigation in the Delaware litigation and in this case.  Moreover, the fact that Kirkland was aware that Defendants described the process as an auction, will have a hugely detrimental impact on Kirkland's credibility, thereby prejudicing its client.

B.     *Defendants' Representations that there was no Plan to Use a Stalking Horse Bidder is Belied by at Least One Document Known to Kirkland*

As set forth in the Complaint, Plaintiff alleges that Defendants devised a plan to use a "stalking horse" bidder in order to drive up the ultimate sale price of the Building.  In the Delaware court, Defendants asserted that there is no basis for such a claim.  Koral Dec. Ex. U p. 18.  However, on March 13, 2003, Eastdil employees sent Bradley V. Ritter of Kirkland a timeline for the sale of the Building, based on a prior discussion between the parties, which included the selection of a "stalking horse" bidder.  *See* Koral Dec. Ex. B.  Testimony from Kirkland concerning this document is necessary to show that despite Defendants' contention to the contrary, there is evidence to suggest that Defendants intended to use a "stalking horse" concept to set the sale price for the Building.  The expected testimony is prejudicial to Defendants because it directly challenges their credibility and undermines factual and legal positions they have asserted.

---

[10]     In addition to the nine Kirkland attorneys listed in the Rule 26(a)(1) disclosures, it is now clear that other Kirkland attorneys have relevant, substantive knowledge of the sale of the Building, including Bradley V. Ritter, Julie C. Olson, and Roberto S. Miceli.

C.      *Defendants' Representations that the Building was Sold Outside of the Bankruptcy Court Process Flatly Contradicts Kirkland's Filings in that Court*

The memoranda submitted in support of Defendants' motion to dismiss contained several representations that the sale of the Building was conducted outside of the bankruptcy process. *See* Koral Dec. Ex. M p.7 ("any alleged representation to the Bankruptcy Court are wholly irrelevant to this dispute. . . Conseco was never under any duty to conduct any 'auction' under the supervision of, or on any terms allegedly represented to, the Bankruptcy Court."); Koral Dec. Ex. I fn.1, 3.  Notwithstanding, and in direct contrast to, these representations, two weeks after the auction took place, Kirkland filed the Plan in the Bankruptcy Court, which stated that "because sale of the GM Building (or the entities owning the GM building or the interest therein), *is being conducted pursuant to this Plan*, any instrument of transfer that would effect transfer of the GM Building as proposed in pleadings filed in these Chapter 11 Cases may not be taxed . . . ." (Koral Dec. Ex. V pp. 54-55) (emphasis added).

In order to refute Defendants' contention that the sale of the Building was not conducted pursuant to the bankruptcy process, Plaintiff will seek the testimony of Kirkland attorneys to demonstrate that:  (1) concerns over the minimization of transfer tax liabilities led Kirkland to seek to have the sale treated for the purposes of the Plan as being conducted pursuant to that Plan and (2) Kirkland thereby represented to the Bankruptcy Court that the sale was being conduct pursuant to the Plan even though it knew Defendants were making or going to make contrary representations to the Delaware Chancery Court.  As drafters of the relevant documents, Kirkland is in the unique position to provide testimony concerning this critical issue.  Once again, the expected testimony on this issue is clearly prejudicial to Defendants as it directly challenges their credibility and undermines legal positions they have asserted.

D.      *Kirkland Required Defendants to Retain them in Future Litigation Arising out of the Sale of the Building*

On September 25, 2003, Charles Cremens, the CEO of Conseco, signed an escrow and indemnity agreement (the "Indemnity Agreement"), which among other things, agreed to indemnify the title insurance company against any losses or expenses related to litigation with Solow over the validity of the sale of the GM Building. The Indemnity Agreement contains handwritten comments from what appears to be a Kirkland attorney (initialed by Mr. Cremens in different handwriting), requiring that Conseco retain Kirkland for future litigation involving Solow. Koral Dec. Ex. D; *see also* Koral Dec. Ex. W (email communication from a Kirkland lawyer confirming that clause requiring Kirkland's retention was a condition of Conseco providing the indemnity). Plaintiff will seek testimony concerning this highly unusual provision, which on its face appears to be a conflict of interest, and which appears to have been used by Kirkland to maintain control of anticipated future litigation and thereby minimize the possibility of being named a defendant.

## CONCLUSION

For the reasons stated in the foregoing memorandum, we respectfully urge this Court to disqualify Kirkland as attorneys for Defendants.

Dated: March 9, 2007
      New York, New York

|  |  |
|---|---|
|  | /s/ Alan Levine |
|  | Alan Levine (AL-1073) |
|  | Jason M. Koral (JK-1044) |
|  | Lauren Fishman (LF-1068) |
|  | COOLEY GODWARD KRONISH LLP |
|  | 1114 Avenue of the Americas |
|  | New York, New York 10036 |
|  | (212) 479-6000 |
|  |  |
|  | *Attorneys for Plaintiff Sheldon H Solow* |

18