UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHELDON H. SOLOW,

               Plaintiff,

-v-

CONSECO, INC. and CARMEL FIFTH, LLC,

               Defendants.

---

No. 06 CV 5988 (BSJ) (TK)

ECF Case

**REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO
DISQUALIFY KIRKLAND & ELLIS LLP AS ATTORNEYS FOR DEFENDANTS**

**PRELIMINARY STATEMENT**

We know now that the Debtor, defendant Conseco, Inc., through its counsel Kirkland &
Ellis ("Kirkland"), announced to its Creditor's Committee in June 2003 that it intended to
proceed with the sale of the GM Building (the "Building") pursuant to an "*informal auction
process.*" This uncontroverted admission – contained in a memorandum authored and
distributed by Kirkland to the Creditor's Committee – flatly contradicts the defense asserted by
the Defendants in this case. As Debtor's counsel and now as litigation counsel, Kirkland's
inextricable entanglement with the transaction that gives rise to this litigation has caused it to
cross over the line and forced it to become a witness against its own client. It is difficult to
imagine a plainer and more direct attorney-client conflict.

The Kirkland "auction" statement is only one of a number of documents that demonstrate
Kirkland's participation in the sale of the Building, during the course of which Conseco duped
bidders for the Building into participating in what proved to be a sham auction process. As
explained in Plaintiff's initial memorandum and Complaint, Conseco's objective initially was to
seek Bankruptcy Court supervision of the sale in order to control its erstwhile business partner

Trump, and then, when that was secured, to create the illusion that the Building would be sold pursuant to a fair auction process, as part of the reorganization process and to entice prospective bidders into participating. Kirkland was counsel to the Debtor (the defendants in this action) and the documents attached to Plaintiff's initial memorandum demonstrate that Kirkland understood and indeed structured the very transaction that is the subject of this litigation. Moreover, the sale of the GM Building was no ordinary transaction; it represented the trophy asset of the reorganization process.

Defendants principal substantive argument in its opposition papers, aside from a diversionary and irrelevant personal attack on the Plaintiff, is their contention that the fact that individual attorneys, acting on behalf of a firm, may need to be disqualified, should not disqualify the entire firm. This defense is not credible in the circumstances of this case. The Kirkland attorney's statement concerning the sale of the Building is contained in a report to the entire Creditors Committee, communicating the position of the Debtor's and Debtor's counsel with respect to the sale of the single most significant asset of the estate. Tellingly, Defendants provide no affidavit or other evidence indicating that this communication represented anything other than Kirkland's position with respect to the true status of this transaction.

Moreover, while Defendants misleadingly attempt to portray the identified conflict as random, unconnected actions by individual, "rogue" Kirkland attorneys, the documents taken as a whole in context demonstrate the concerted and coordinated action of the Kirkland law firm in implementing their client's strategy. In particular, the documents already discovered to date demonstrate that the Kirkland firm was involved in and played a key strategic role in several key steps of the Conseco auction scheme as it is alleged in the Complaint.

## ARGUMENT

### I.     The Testimony of Kirkland Attorneys is Necessary and Prejudicial to Defendants

As set forth in the Complaint, this case is about a fraud scheme in connection with Conseco's sale of the Building.  In 2003, Conseco's bankruptcy estate sought to gain control over its investment in the Building, whose ownership was disputed by Donald Trump's organization ("Trump").  Thus, Conseco publicly declared its intention of monetizing the Building for the benefit of shareholders through an open auction.  In furtherance of this declared objective, Conseco, by and through attorney Reed Oslan, litigation counsel in this case, sought an order from the Bankruptcy Court with jurisdiction over its estate to compel such an auction pursuant to Section 363 of the Bankruptcy Code.

Conseco failed to obtain its Section 363 court order, but eventually settled with Trump, leaving it free to carry out the proposed auction.  Actually, upon information and belief as alleged in the Complaint, Conseco secretly did not want to auction the property at all, but to convey it to a favored bidder, Macklowe.  But Conseco had very good reasons to conceal this plan and represent to the world that it still desired to sell the Building pursuant to an open auction.[1]  First, such a course of action, as consistent with Conseco's filings with the Bankruptcy Court with respect to its plans to dispose of the Building, would allow Conseco to take the position that the sale of the Building was conducted pursuant to its court-ordered bankruptcy plan, thus allowing it to avoid transfer taxation (worth some $43 million).  Secondly, pretending to hold a fair auction would allow Conseco to entice bona fide bidders for the Building to be used as unwitting stalking horses in order to set the price at which the Building would be handed

---

[1] One way in which Conseco concealed its plan was in choosing not to file bankruptcy petitions for Carmel Fifth and other subsidiaries, thus avoiding the scrutiny of a suspicious United States Trustee.

to Macklowe.  Third, representing that the sale would be conducted via a fair auction as opposed to a secret, inside deal was far more likely to be acceptable to the Creditor's Committee.

Defendants, in their motion to dismiss the Complaint and their opposition to this Motion, dispute this version of events.  They contend, in the face of clear evidence to the contrary, that there was never any suggestion by Conseco that the Building would be sold via auction.[2]

This motion arises because Defendants legal position is contradicted by communications and documents authored by their own counsel in the litigation, including:

- Communications in which Kirkland lawyers acknowledge the importance of having the sale be treated as pursuant to the bankruptcy plan to save on transfer taxes.

- Communications involving Kirkland lawyers structuring the sale on behalf of Conseco, in which a Kirkland lawyer openly describes the proposed sale as an auction.

- Kirkland legal filings seeking to have the sale treated as pursuant to the bankruptcy plan.

- Documents demonstrating Kirkland's origination of the "stalking horse bidder" concept in connection with the transaction.

- Documents that appear to demonstrate that Kirkland compelled its own client to retain it in the event of future litigation with Solow, so as maintain Kirkland's control over the situation and facilitate the cover-up.

These documents, taken together, demonstrate Kirkland's participation in and direction of key components of the sale process and transaction that give rise to the allegations of the Complaint.   Indeed, given Kirkland's integral entanglement in the transaction that gives rise to this litigation, as counsel for the Debtor, it is not surprising to find that Kirkland is hopelessly conflicted with respect to the conduct of the litigation.

---

[2] Defendants take this position, because under New York law, a party who purports to sell an asset via auction is legally obligated to hold a fair auction pursuant to its term.  *See Valeo Engine Cooling v. Atkinson*, 658 N.Y.S. 2d 285, 286 (1st Dept. 1997).

A.    *Testimony of Kirkland Attorneys Will Be Used to Contradict Defendants'*
      *Central Defense that the Building was not Sold Pursuant to an Auction*

In a document inexplicably withheld in the Delaware litigation, a Kirkland attorney

involved in structuring the sale of the Building represented that the Building was being sold

pursuant to an auction process.  The memorandum – dated late June 2003 – updated the Conseco

Creditors Committee on the status of the Building at a time *after* the formal Section 363 auction

was no longer needed to achieve Conseco's objectives in its dispute with Trump.  The

memorandum goes on to state that in spite of this fact, "[t]he sale process will instead be

conducted through and [sic] *informal auction process*."  *See* Declaration of Jason M. Koral,

dated March 9, 2007 ("Koral Dec.") Exhibit ("Ex.") A p. 2 (emphasis added).  This admission of

fact directly contradicts what Defendants acknowledge is their key defense in this case – that the

Building was not sold pursuant to an auction.

The choice of the term "informal auction" is no accident.  The "formal auction"

contemplated pursuant to Section 363 had not occurred, and the Creditor's Committee was

understandably concerned about the process by which this crucial asset would be sold.  The use

of the term "informal auction" by Kirkland as Debtor's Counsel was designed to reassure the

Creditor's Committee that notwithstanding the collapse of the plan to sell the Building pursuant

to Section 363, a similar auction process would nonetheless be pursued by Conseco on its own.[3]

Under the circumstances, it is clear that this statement reflected the position of the firm as

counsel for the Debtor.  The attorney making the statement in question was part of a Kirkland

deal team structuring the sale on behalf of Conseco, and reporting to the Creditor's Committee

about the status of the sale.  This communication, which was distributed to the entire Creditor's

---

[3] Further reassurance was provided by the fact that Eastdil, the sales agent initially retained to conduct the Section 363 sale, was kept on to implement the subsequent auction on behalf of the Defendants and the basic format remained the same.

Committee, notified them of the Debtor's plan for the Building immediately after the Trump dispute was resolved.  Defendants have not offered an affidavit from any Kirkland lawyer responsible for the sale refuting this admission.[4]  Accordingly, testimony from *all* of the Kirkland lawyers involved in the sale will be necessary to help Plaintiff refute the purported defense that the Building would not be sold via an auction.[5]  Such testimony will obviously be adverse to the Defendants because it will contradict the "no auction" defense.

The existence of this revealing memorandum will also require the testimony of Mr. Oslan, litigation counsel in this matter, for two reasons.  First, Mr. Oslan is one of the Kirkland lawyers who represented the Debtor in the sale process and whose testimony will be required to establish the Kirkland firm's understanding of the sale as an auction.  Although the Opposition modestly represents that Mr. Oslan's representation of Conseco was limited to the Delaware litigation and the recent litigation brought by Leslie Dick (Defs.' Opp'n to Pl.'s Mot. to Disqualify at fn. 6), in fact Mr. Oslan served as bankruptcy litigation to the Debtor, including representation of Conseco in front of the Bankruptcy Court in connection with the Debtor's Section 363 application for the sale of the Building.

Second, the defendants have repeatedly injected the Delaware litigation into this matter in a transparent attempt to sway the Court, despite the fact that the Delaware Court denied the Defendants' motion to dismiss, and despite the Delaware Chancellor's qualification that his ruling was made only on the limited record before him.  Koral Dec. Ex. L pp. 2-3.  As Defendants so persist, Mr. Oslan's testimony will be required to demonstrate that Defendants'

---

[4] Indeed no such affidavit could have been offered, as the subsequent conduct and disclosure of Conseco is fully consistent with the representation contained in this communication.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 5-6).

[5] Although we agree with Defendants that the document itself constitutes evidence of an admission, the testimony of the lawyers on the deal team will be required to establish the key fact of Plaintiff's behavior.  Defendants' argument that the documentary admission should be sufficient to establish the point is undermined by the fact that Defendants continue, in spite of the documentary admission, to claim that the sale was not an auction.

citation to the result of the 2003 Delaware litigation – including in their opposition to this motion – is misplaced.  Mr. Oslan's testimony will establish that not only was the Delaware opinion secured on the basis of an incomplete record, but a record bereft of key evidence, due to Conseco's decision to withhold the revealing memorandum from the Delaware court.  Mr. Oslan's testimony will be adverse to Defendants because the fact that the Delaware court relied on Mr. Oslan's statement, and did not have access to the improperly withheld document, in rendering its decision, draws into question the level to which this Court can rely on the Delaware court's decision, as Defendants have repeatedly urged this Court to do – including in the very submission opposing this motion.[6]

      B.    *Testimony by Kirkland Attorneys Concerning the "Stalking Horse" Document Might be Adverse to Defendants' Position that They Did Not Use a "Stalking Horse"*

Plaintiff is aware that the concept of using a "stalking horse" bidder was originally developed in connection with the Section 363 sale.  (Pl's Mot. to Disqualify at 2).  However, Plaintiff contends that this plan was not dropped, even after it was determined that the Building would not be sold pursuant to Section 363.  Plaintiff's contention, initially based on representations made by Conseco and its agents, as well as the written terms of the auction, has been further bolstered by the evidence of Kirkland's representation to the Creditor's Committee that an informal auction would be held notwithstanding the dropping of the formal Section 363 auction.

Plaintiff intends to seek discovery and testimony regarding the "stalking horse" document from all individuals involved in its drafting.  The deposition of various Kirkland attorneys is

---

[6] In their brief, Defendants argue that Mr. Oslan's statement meant that the word "auction" did not appear in any sales documents relied on by Plaintiff.  However, the transcript does not support Defendants' interpretation.  Mr. Oslan's statement that there were "no documents" containing the word auction was unequivocal.  Chancellor Chandler could not have reasonably imagined that Mr. Oslan's statement was consistent with his simultaneous knowledge of an email from a Kirkland transactional lawyer describing the sale as an auction.

necessary to this issue because the documentary evidence demonstrates that the "stalking horse" concept was developed by Kirkland in connection with the sale of the Building. The testimony will also be adverse because it will contradict Conseco's defense that no such concept was contemplated with respect to the sale of the Building.

  C.  *Testimony by Kirkland Attorneys Concerning Documents Submitted to the Bankruptcy Court Contradict Defendants' Assertion that the Building was Sold Outside of the Bankruptcy Process*

   Defendants continue to focus on the fact that the Building was not sold pursuant to Section 363. Plaintiff does not dispute that fact. The basis of Plaintiff's argument is that even after Defendants withdrew their Section 363 application, they continued to act in a way that led Plaintiff and others to believe that the Building would be sold pursuant to an auction similar in form to that previously represented in the Section 363 sale application, even if not pursuant to the formal requirements of Section 363. In short, Plaintiff's argument is that Defendants, through their statements and actions, including their actions with respect to the Bankruptcy Court, caused Plaintiff and other bidders to believe the sale of the Building would conform in its basic format to the proposal outlined in the Section 363 application. In its papers to support its motion to dismiss, Defendants have attempted to respond to this argument, in part, by contending that the ultimate sale "was not undertaken in the Bankruptcy Court or pursuant to the Bankruptcy Court's discretion." (Defs.' Opp'n to Pl.'s Mot. to Disqualify at fn. 1). That response, however, is contradicted by the statements of Kirkland to the Bankruptcy Court, made immediately after the sale, in the Sixth Amendment to the Bankruptcy Plan. Because Kirkland attorneys made the representations, their testimony is necessary to establish that the sale of the Building was indeed designed to be conducted pursuant to the Bankruptcy Plan, testimony also adverse to Defendants' defense that the sale had nothing to do with the bankruptcy process.

D.     *Testimony of Kirkland Attorneys Will be Used to Demonstrate that Kirkland Used an Indemnity Agreement to Maintain Control of this Litigation and Limit Their Potentially Adverse Testimony*

Defendants contend that it is not unusual for an indemnity agreement to provide that the indemnitor can use counsel of its choosing to defend a litigation. However, the document in question does not, in fact, grant indemnitor the right to any counsel of its choosing.  To the contrary, it forces the indemnitor use Kirkland & Ellis LLP for certain future litigation against Plaintiff, regardless of any intervening circumstances.  *See* Koral Dec. Ex. D.

Even more troublesome, the handwriting which added changes to the indemnification provision is not the same as the other handwritten changes (which appear to have been initialed by Charles H. Cremens).  That suggests the strong possibility, not denied by Defendants in their brief, that the provision calling for the use of Kirkland in future litigation was written in by a Kirkland attorney.  That possibility is further strengthened by the email chain between a Kirkland attorney and the indemnified party, cited by Kirkland in their opposition.  Koral Dec. Ex. W.  In this document, a Kirkland attorney represents to the counterparty Chicago Title Insurance Company that this retention provision is a pre-requirement to the provision of the indemnity.

Testimony from Kirkland attorneys regarding the indemnity agreement is necessary to determine whether Defendants choice of counsel in this litigation was truly made voluntarily by Conseco.

## II.     Plaintiff's Motion is Sufficiently Particularized to Satisfy the Legal Standard

Defendants argue that Plaintiff's motion is premature and insufficiently particularized because it fails to identify the individual Kirkland attorneys from whom Plaintiff will seek trial testimony.  Defendants are mistaken.  Plaintiff's motion plainly identifies the specific

representations, documents, and admissions made or drafted by Kirkland attorneys that

demonstrate positions taken by Kirkland attorneys in previous proceedings are contrary to

positions Defendants are now taking.  In many instances, the precise identification of attorneys is

in the documents cited.

It is true that based on the limited discovery reviewed to date, Plaintiff is not in a position

to verify with particularity <u>all</u> of the Kirkland attorneys who may be called to testify adversely to

their client.  Such a precise identification must await additional discovery, as well as the

production of Defendants' privilege log, which has been inexplicably withheld to date.[7]

However, based on information already in our possession, it is clear that, at the very least, the

Kirkland lawyers responsible for arranging the sales process will be necessary witnesses to

testify that they structured that process as an auction, in direct contradiction to Defendants' legal

position that it was not so structured.  That fundamental contradiction, standing alone, creates a

sufficient presumption of conflict as to require Plaintiff and his attorneys to promptly bring the

issue to the Court's attention.  *See* New York Disciplinary Rule 1-103(A) (requiring a lawyer

possessing knowledge of an attorney's violation of a disciplinary rule that raises a "substantial

question" as to that lawyer's fitness as a lawyer to report such knowledge to a tribunal with

authority to act).

If Plaintiff waited until after depositions to file this motion, no doubt Defendants would

then argue that the motion to disqualify is too late and that removal of counsel at such a late

---

[7] On April 17, 2007, Lauren R. Fishman, an attorney for Plaintiff, called Amy C. Haywood, counsel for Defendants, and explained that she was in a position to exchange Plaintiff's privilege log and asked when Defendants' privilege log could be exchanged.  Ms. Haywood indicated that she would respond the next day.  Two days later, Ms. Fishman emailed Ms. Haywood and asked for a response.  Ms. Haywood replied that she did not have a definitive date as to when Defendants' privilege log could be exchanged.  On April 19, 2007, counsel for Plaintiff sent their privilege log to Defendants and indicated that they expected Defendants' privilege log in return.  Eleven days later, Ms. Haywood sent a letter indicating that Defendants are unable to produce their privilege log at this time due to the "substantial resources" dedicated to writing their opposition memorandum and because their log is longer than Plaintiff's.  In this letter, Ms. Haywood does not address the fact that Defendants have had months prior to this motion to work on their privilege log.

stage would unduly prejudice them.  However, if the Court feels that a more particularized

inquiry may be helpful, it may order discovery into the matter, including the deposition of

Kirkland attorneys, and hold an evidentiary hearing on this matter at a later date.  *Cf. Renner v.*

*Chase Manhattan Bank*, No. 98 Civ. 926, 2002 WL 87665 *3 (S.D.N.Y. Jan. 22, 2002) (delaying

decision on motion to disqualify until after the attorney-witness was deposed).

## III.    Disqualification of the Entire Law Firm is Appropriate

Defendants' arguments about prematurity aside, the main defense advanced in opposition

to the Motion is that disqualification should be limited to the individual attorneys identified as

making statements in the documents attached to the Motion.  Such a remedy would be grossly

insufficient in this case.  The documents do not demonstrate that individual lawyers acted

independently in making conflicting statements, as if off on some sort of a frolic.  Rather, they

demonstrate Kirkland's legal and strategic position, as a law firm, acting on behalf of a

significant client in furtherance of that client's objectives.  Thus, the communications implicate

the entire Kirkland deal team, as well as the actions and representations of advocates

representing the actions of that deal team in court.

Moreover, Defendants' argument conflicts with the plain language of New York

Disciplinary Rule 5-102(D), which clearly requires that both the lawyer *and* the law firm be

disqualified once it is determined that a lawyer of that firm "may be called as a witness on a

significant issue" and his "testimony is or may be prejudicial to the client."  22 NYCRR

1200.21[d].  Defendants ask this Court to apply the less stringent rule of the American Bar

Association ("ABA").  Although New York courts may sometimes refer to the ABA

pronouncements for guidance,  it is New York's Disciplinary Rules that have been adopted by

the Southern District of New York.  *See* S.D.N.Y. Local Civil R. 1.3, 1.5.  Moreover, all

11

attorneys appearing *pro hac vice* in the Southern District of New York, as counsel for

Defendants are in this case, must agree to be bound by these rules.  *See* S.D.N.Y. Local Civil R.

1.3(a).

Defendants' reliance on *Occidental Hotels Management B.V. v. Westbrook Allegro*

*L.L.C.*, 440 F. Supp. 2d 303 (S.D.N.Y. 2006) is misplaced.  In *Occidental*, the Court rejected a

disqualification motion because it found no basis in the record to conclude that the attorney's

testimony would be adverse to his client.  *Id.* at 314-15.  In this case, unconverted evidence

exists in which a Kirkland attorney states a position directly adverse to his client on numerous

issues identified by the client as a key to the fact pattern and defense in the case.  Thus, we have

here the opposite fact pattern from *Occidental* as the adverse nature of the testimony is apparent

on the face of the record. [8]

Secondly, in *Occidental* the potential lawyer-witness to be disqualified had been a

company in-house lawyer at the time he learned of the matter on which his testimony was

sought.  *Id.* at 306-08.  The firm sought to be disqualified had not acted for the client in

connection with the transaction at issue in the case, and was only brought into the matter years

later.  Here, on the other hand, the testimony sought from Kirkland attorneys is in connection

with the firm's representation of a major client with respect to the very transaction at issue in the

case.  Far from having no involvement in the underlying events, as was the case with the Jones

Day firm in *Occidental*, Kirkland was a major player in key events underlying this litigation,

developing and implementing the Defendants' strategy with respect to the sale of the Building as

Debtor's counsel.  Because the testimony sought in this case implicates the entire law firm's

---

[8] For the same reason, *April Broadcasting, Inc. v. Smith*, 95 Civ. 7664, 1996 U.S. Dist. LEXIS 3594 (S.D.N.Y. Mar. 25, 1996), in which no evidence was presented suggesting that adverse testimony would be given by the firm sought to be disqualified, is also inapposite.

position with respect to the transaction, the firm's recusal is appropriate, as counseled by the New York Code.

## IV.    Defendants' Personal Attack on Plaintiff is Irrelevant to this Motion

Lacking strong defenses to the merits of the disqualification motion, Defendants apparently invoke the old adage "the best defense is a good offense" and devote significant portions of their brief to making personal attacks against the Plaintiff.  However, Defendants' *ad hominem* attacks against Mr. Solow are more offensive than effective offense.  They are irrelevant to this motion and do not merit further reply.

## CONCLUSION

For the reasons set forth above and in Plaintiff's initial brief, we respectfully request that this Court disqualify Kirkland as attorneys for Defendants.

Dated: May 2, 2007
      New York, New York

|  |  /s/ Alan Levine_____ |
|  | Alan Levine (AL-1073) |
|  | Jason M. Koral (JK-1044) |
|  | Lauren Fishman (LF-1068) |
|  | COOLEY GODWARD KRONISH LLP |
|  | 1114 Avenue of the Americas |
|  | New York, New York 10036 |
|  | (212) 479-6000 |
|  |  |
|  | *Attorneys for Plaintiff Sheldon H. Solow* |

Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000

Alan Levine (AL-1073)
Jason Koral (JK-1044)
Lauren Fishman (LF-1068)

| | |
|---|---|
| SHELDON H. SOLOW,                      Plaintiff, | No. 06 CV 5988 (BSJ) (TK) |
| -v- | ECF Case |
| CONSECO, INC. and CARMEL FIFTH, LLC,<br><br>                      Defendants. | |

      I hereby certify that I caused a true and correct copy of the attached Reply Memorandum of Law in Further Support of Plaintiff's Motion to Disqualify Kirkland & Ellis LLP as Attorneys for Defendants, dated May 2, 2007, to be served electronically and by Federal Express on May 2, 2007, upon the following:

      Reed Oslan, P.C.
      Kirkland & Ellis LLP
      200 East Randolph Drive
      Chicago, Illinois 60601
      (312) 861-2000
      Attorney for Defendants

Dated: May 2, 2007
      New York, New York

               COOLEY GODWARD KRONISH LLP
               By:   /s/ Lauren R. Fishman_____

               Attorneys for Plaintiff Sheldon H. Solow
               1114 Avenue of the Americas
               New York, New York 10036
               (212) 479-6000