```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SHELDON H. SOLOW,                 :
                                  :
                Plaintiff,        :     06 Civ. 5988 (BSJ)(THK)
                                  :
                                  :
        -against-                 :     MEMORANDUM OPINION
                                  :        AND ORDER
                                  :
CONSECO, INC. and CARMEL          :
FIFTH, LLC,                       :
                                  :
                Defendants.       :
----------------------------------X
```

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Sheldon H. Solow ("Plaintiff") filed this action on October 8, 2006, alleging that Conseco, Inc. ("Conseco"), and Carmel Fifth, LLC (collectively, "Defendants"), fraudulently auctioned the General Motors Building, at 767 Fifth Avenue in New York City (the "GM Building" or "Building"). Specifically, Plaintiff alleges that, despite representations to the Plaintiff and others that the Building would be sold through a fair and open auction, Defendants instead engaged in a sham auction used merely to establish the price at which the Building would be sold to Defendants' favored bidder, Harry Macklowe ("Macklowe"). (See Memorandum of Law in Support of Plaintiff's Motion to Disqualify Kirkland & Ellis as Attorneys for Defendants, dated Mar. 9, 2007 ("Pl. Mem."), at 3-5.) Plaintiff asserts, among other things, causes of action for fraud, unjust enrichment, and breach of the duty to hold a fair auction. (See Complaint, dated Aug. 7, 2006 ("Compl."), ¶ 37.)

The action was referred to this Court for general pretrial

supervision.  Presently before the Court is Plaintiff's Motion to Disqualify Kirkland & Ellis, LLP ("Kirkland" or "Kirkland & Ellis") as attorneys for Defendants.[1]  The motion is denied for the reasons set forth below.

**BACKGROUND**

The following material facts are undisputed unless otherwise indicated.

I.  <u>Bankruptcy Proceedings</u>

In July 1998, Carmel Fifth, LLC, an indirect subsidiary of Conseco, Inc., and Donald Trump entered into an agreement to jointly purchase the GM Building, which they acquired shortly thereafter. (<u>See</u> Pl. Mem., at 3; Defendants' Opposition to Plaintiff's Motion to Disqualify Kirkland & Ellis, dated Apr. 23, 2007 ("Def. Mem."), at 4.)  Subsequently, on December 17, 2002, Conseco filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois. (<u>See</u> Pl. Mem., at 3; Def. Mem., at 4.)  Meanwhile, disagreements developed between Conseco and Trump over the GM Building, which eventually resulted in Conseco filing an adversary complaint in the bankruptcy court against Trump, regarding ownership of the GM Building.  On March 5, 2003, Conseco sought an "Order Granting Authority to Sell Certain Real Property; Approving Bid and Other Procedures For and

---

[1] On September 18, 2006, Defendants moved to dismiss the action for failure to state a claim.  That motion is currently pending before District Judge Barbara S. Jones.

2

Establishing the Date, and Place of, Auction and Hearing; and Granting Authority to Enter into a Contract Containing a Break-Up Fee." Conseco also sought an order authorizing it to retain Eastdil Realty Company, LLC ("Eastdil") as its real estate agent, to assist in the sale of the GM Building. (See Bankruptcy Court Motions, Exhibits ("Ex.") G & H to Declaration of Jason M. Koral in Support of Plaintiff's Motion ("Koral Decl.").)

Trump disputed jurisdiction in the bankruptcy court, which subsequently dismissed Conseco's adversary complaint in part, for lack of subject matter jurisdiction, and stayed the remainder of the proceeding to allow the parties to engage in arbitration. (See Order, dated Apr. 4, 2003, Ex. D to Declaration of Amy C. Haywood in Opposition to Plaintiff's Motion ("Haywood Decl.").) On June 30, 2003, the parties stipulated to a dismissal of the adversary proceeding "and all related proceedings concerning the subject matter of this adversary proceeding" with prejudice. (Stipulation and Order, dated July 1, 2003, Ex. G to Haywood Decl.)

II. Sale of the GM Building

Upon resolving its dispute over ownership with Trump, Conseco withdrew its application to the bankruptcy court to conduct a Section 363 sale and instead enlisted Eastdil to conduct a managed sale process for the Building. (See Pl. Mem., at 3.) In July 2003, Eastdil circulated marketing materials to prospective bidders that included "a confidentiality agreement . . . to be executed before

conducting initial due diligence." (Compl. ¶ 37.)

On July 16, 2003, in order to participate in the sales process, Plaintiff executed the "Principal Confidentiality Statement."  The agreement stated:

> The undersigned acknowledges that the Property has been offered for sale subject to withdrawal from the market, change in any offering price, prior sale or rejection of any offer, lack of satisfactory credit references of any prospective purchaser, or for any reason whatsoever, without notice.  The Owner expressly reserves the right in its sole discretion to terminate, at any time with or without notice and without liability, any discussions with a party regarding a possible sale of the Property.

(Principal Confidentiality Agreement, dated July 16, 2003 ("Conf. Agrmt."), Ex. H to Haywood Decl., at ¶ 8.)[2]

After Plaintiff submitted his bid by the August 11, 2003 deadline, Eastdil informed Plaintiff that he was "not selected by the Owner to participate in the final round," but that since he had "indicated that [he] desire[d] to continue in the process," he could submit a final offer by no later than August 27, 2003. (Eastdil Letter, dated Aug. 13, 2003, Ex. J to Haywood Decl.)  The letter reiterated that Conseco reserved the right, "in its sole and absolute discretion, to accept or reject any offer for any reason,"

---

[2] Plaintiff contends that, despite this language, Defendant Conseco "represented to all interested parties that it would conduct its own auction of the Building, using rules and procedures similar to those initially proposed to the Bankruptcy Court."  Specifically, Plaintiff alleges that Conseco created the appearance that it would be "adhering to a fair auction procedure" so that it "could appear to creditors to be acting consistent with its fiduciary duty to secure the best possible value for the sale of the Building." (Pl. Mem., at 4.)

and that factors "considered by the Owner in selection of a purchaser will include price, timing (to complete due diligence, and to close), level of due diligence completed to date, closing capacity and credibility and earnest money deposit." (Id.) Plaintiff submitted a final offer, but on August 28, 2003, Conseco accepted the bid of Harry Macklowe, awarding him the sale of the GM Building. (See Pl. Mem., at 4-5; Def. Mem., at 6.)

Plaintiff alleges that, because Defendants represented that the Building would be sold through a fair and open auction, he invested significant effort in preparing a bid for the Building. (See id. at 4.)  He claims that at the final round of bidding, he submitted the "best, credible bid," and one that was $35 million greater than that of Macklowe. (Id.)  Plaintiff further contends that Macklowe's bid was defective and contained false representations, and that Macklowe was essentially allowed to circumvent the bidding process by walking into Defendants' offices the day after the auction had closed and simply matching the $1.4 billion offer made by Plaintiff. (Id. at 4-5.)

III. Previous Litigation

Plaintiff subsequently brought an action in Delaware Chancery Court, seeking to nullify the sale of the Building to Macklowe, enjoin the closing, and direct Defendants to negotiate with Plaintiff for the sale of the Building.  The court denied Plaintiff's request for an injunction, stating that "Solow did not

5

convince me that an auction, in the ordinary sense of that word, was ever promised by defendants in connection with the sale of the GM Building." (Delaware Court Opinion, dated Sept. 24, 2003, Ex. K to Haywood Decl., at 2-3.)  The court further concluded that "all the documents and written evidence contradict Solow's basic claim that an auction, with specified ground rules, was to be held in connection with the GM Building sale." (Id. at 3.)

After the court denied Plaintiff's request for injunctive relief, Plaintiff voluntarily dismissed his suit without prejudice. Plaintiff does not appear to have taken any further legal action with regard to this matter until he filed the instant action in October of 2006.

In addition to representing Defendants in this action, Kirkland & Ellis served as Defendants' counsel in the initial bankruptcy proceeding and Plaintiff's prior suit in the Delaware Chancery Court, as well as with respect to the sale of the GM Building.  It is Kirkland's representation in these prior matters (or more specifically, representations it made during the course of these prior matters) that forms the basis of Plaintiff's current motion to disqualify Kirkland & Ellis as Defendants' counsel in the instant action.

## DISCUSSION

I.   Legal Standard

"The authority of federal courts to disqualify attorneys

6

derives from their inherent power to 'preserve the integrity of the adversary process.'" Hempstead Video, Inc., v. Inc. Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005) (citation omitted). "In a technical sense the only truly binding authority on disqualification issues is [Second] Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority." Skidmore v. Warburg Dillon Read LLC, No. 99 Civ. 10525 (NRB), 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001). Although disqualification motions within the Second Circuit often look to state disciplinary rules for guidance, "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." Hempstead Video, 409 F.3d at 132.

A federal court's decision of whether to disqualify counsel "must ultimately be guided by the goal of a trial process that lacks any hint of a taint." Skidmore, 2001 WL 504876, at *2. With rare exceptions, disqualification is generally ordered in two kinds of cases. See Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979). First, where an attorney's conflict of interest in violation of Code of Professional Responsibility Canons 5 and 9 undermines the court's confidence in the attorney's representation of his client.[3] See id. Second, where the attorney is, at least

_____

[3] Canons 5 and 9 provide that a lawyer should exercise independent judgment on behalf of his client, and should avoid the appearance of professional impropriety. See Nyquist, 590 F.2d

potentially, in a position to use privileged information gained from the other side through prior representation, giving the present client an unfair advantage. See id. "[U]nless an attorney's conduct tends to taint the underlying trial by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney." Nyquist, 590 F.2d at 1246 (internal quotation marks and citation omitted).

Plaintiff contends that, under the advocate-witness rule, Kirkland's disqualification is required because several of its attorneys will give testimony adverse to Defendants. (See Pl. Mem., at 11-12.) Plaintiff bases his argument on the New York Code of Professional Responsibility's Disciplinary Rules (the "New York Code") 5-102(B) & (D). See 22 NYCRR §§ 1200.21(b) & (d).[4]

---

at 1246.

[4] When ruling on disqualification motions, courts in this circuit have considered both the New York Code as well as pronouncements by the American Bar Association (the "ABA"). See Fields-D'Arpino v. Rest. Assocs., Inc., 39 F. Supp. 2d 412, 414 n.2 (S.D.N.Y. 2002). The language of the advocate-witness rule varies markedly between the ABA's Model Code of Professional Responsibility (the "Model Code"), the ABA's Model Rules of Professional Conduct (the "Model Rules"), and the New York Code. Although not bound by the New York Code, and aware that the "Second Circuit in particular has repeatedly indicated that [the New York disciplinary rules] need not be rigidly applied," Renner v. Townsend Fin. Servs. Corp., No. 98 Civ. 926 (CSH), 2002 WL 1013234, at *6 (S.D.N.Y. May 20, 2002), the Court's analysis focuses on the New York Code's Disciplinary Rule addressing "lawyers as witnesses." Moreover, both sides have argued the motion applying the New York Code.

Disciplinary Rule 5-102(b) of the New York Code provides,

> Neither a lawyer nor the lawyer's firm shall accept employment in contemplated or pending litigation if the lawyer knows or it is obvious that the lawyer or another lawyer in the lawyer's firm may be called as a witness on a significant issue other than on behalf of the client, and *it is apparent that the testimony would or might be prejudicial to the client.*

22 NYCRR § 1200.21(b) (emphasis added).  Subsection (D) is a parallel provision applying in the context of continued representation (instead of initial representation).  See 22 NYCRR § 1200.21(d).  These rules come into play where a lawyer's testimony would contradict or undermine his client's factual assertions.  See Lamborn v. Dittmer, 873 F.2d 522, 531 (2d Cir. 1989); GPA Inc. v. Liggett Group, Inc., No. 94 Civ. 5735 (AGS), 1994 WL 613267, at *2 (S.D.N.Y. Nov. 4, 1994).

"To succeed on a motion to disqualify an attorney under Disciplinary Rule 5-102(b), a movant must show that the adverse attorney's testimony is both necessary and substantially likely to be prejudicial to the attorney's client." Cabble v. Rollieson, No. 04 Civ. 9413 (LTS)(FM), 2006 WL 464078, at *4 (S.D.N.Y. Feb. 27, 2006); see also April Broadcasting, Inc. v. Smith, No. 95 Civ. 7664 (LMM), 1996 WL 137487, at *5 (S.D.N.Y. Mar. 27, 1996).  In assessing necessity, courts consider such factors as "the significance of the matters as to which the attorney's testimony is sought, the weight of the testimony, and the availability of other evidence." Cabble, 2006 WL 464078, at *4.  The rule requires that

a "lawyer's testimony be necessary, not simply that it be the best evidence," and to that end, "courts deem a lawyer's testimony necessary only if there [are] no other witnesses to the circumstances at issue." Id. at *5 (internal citations omitted).

For testimony to be prejudicial, "the 'projected testimony of a lawyer or firm member must be sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony.'" Occidental Homes Mgmt. B.V. v. Westbrook Allegro, LLC, 440 F. Supp. 2d 303, 314 (S.D.N.Y. 2006) (quoting Lamborn, 873 F.2d at 531). "[T]he moving party bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring is substantial." Id.

"[A] party moving for disqualification carries a 'heavy burden,' and must satisfy a 'high standard of proof.'" Cabble, 2006 WL 464078, at *3 (citing Evans v. Artek Sys. Corp., 715 F.2d 788, 794 (2d Cir.1983); Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir.1978)). "Disqualification motions are often brought for tactical reasons, and even when made in good faith, delay litigation." See Occidental Hotels, 440 F. Supp. 2d at 309 (internal citations omitted). In evaluating motions to disqualify counsel, a federal court balances a client's right to freely choose his counsel against the need to maintain the standards of the legal

10

profession. See id. at 791 (quoting Gov't of India, 569 F.2d at 739).

Moreover, "[d]isqualification motions premised upon the advocate-witness rule are subjected to strict scrutiny because of the strong potential for abuse when a lawyer invokes the need to call opposing counsel as a witness and then acts to disqualify him as counsel." Paramount Comm., Inc. v. Donaghy, 858 F. Supp. 391, 394 (S.D.N.Y. 1994) (internal citations and quotations omitted); see also Lamborn, 873 F.2d at 531 ("Because the courts must guard against tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions under subdivision (B)." (internal citations omitted)).

II.  Analysis

Plaintiff identifies four aspects of Kirkland & Ellis' representation of Defendants in the underlying bankruptcy proceeding and sales process that, he argues, require Kirkland & Ellis to provide adverse witness testimony, and thus warrant its disqualification.  Specifically, Plaintiff argues that Kirkland's testimony is necessary and prejudicial because 1) "Kirkland acknowledged that the sale of the Building would be an 'auction,' directly contradicting the most critical representations made by Defendants and Kirkland in [the Delaware] litigation and in this case," 2) "Kirkland was aware that Defendants' agent for the sale of the Building had originally intended to use a 'stalking horse'

11

bidder, contrary to Defendants' assertion[s] . . . ," 3) "Kirkland filed documents in the bankruptcy court in the Northern District of Illinois that conflict with Defendants' repeated claims that the building was sold outside the bankruptcy process," and 4) "Kirkland apparently required Defendants to retain them in future litigation arising out of the sale of the Building . . . ." (Pl. Mem., at 1-2.)   Kirkland & Ellis argues that its testimony on each of these four issues is neither necessary nor adverse to its clients, and that Plaintiff's arguments are wholly meritless. (See Def. Mem., at 11-13.)   The Court will address each of Plaintiff's arguments separately.

A.   <u>Kirkland's Representations Concerning the Auction Process in the Delaware Court</u>

Plaintiff argues that Kirkland's statements in this action and in the prior Delaware action, that Defendants had not intended or led Plaintiff to believe that the sale of the GM Building would be conducted through an auction, are contradicted by a memorandum prepared by a former Kirkland attorney to the Conseco Bankruptcy Creditors' Committee (the "Committee"), in which the phrase "informal auction process" was used to describe the sales process. (See Pl. Mem., at 13.)   Specifically, during oral argument in the Delaware action, Kirkland's attorney (who is also the lead attorney in this action) stated that "[t]he entirety of [Plaintiff's] claim turns on a singular allegation that the process here was an auction.   Now, if there was an auction — if this was an auction,

12

one would think that there would be a document that says the word 'auction.' There is none." (Transcript of Delaware Oral Argument, dated Sept. 23, 2003, Ex. K to Koran Decl., at 54.)  Plaintiff argues that this statement, and Defendants' similar position in the instant action, are contradicted by a document prepared by a former Kirkland attorney in which she informed the Committee that "there will be no Section 363 sale," and "[t]he sale process will instead be conducted through and [sic] informal auction process." (Memorandum to Committee, dated June 26, 2003, Ex. A to Koral Decl., at 2.)  On the basis of this alleged inconsistency, Plaintiff argues that "it is now clear that [Kirkland's] testimony is necessary not merely to obtain relevant information, but to disprove Defendants' central defense, and the basis for the motion to dismiss: that the Building was not sold in an auction." (Pl. Mem., at 15.)  The Court is unpersuaded.

First, the Court is not convinced that testimony from Kirkland about this document is at all necessary.  While a central issue in this case may be whether Defendants represented to potential bidders that they would conduct the sales process through an auction, evidence of a single email from Kirkland, which was not sent to Plaintiff, and in which an attorney used the ambiguous and undefined phrase "informal auction process," sheds little light on what representations were made to Plaintiff, and is simply not the smoking gun Plaintiff appears to think it is.  Indeed, it would

appear to have little relevance.  The language of the Principal Confidentiality Agreement, submitted to all potential bidders by Eastdil (and signed by Plaintiff), states that "the Property has been offered for sale subject to withdrawal from the market, change in any offering price, prior sale or rejection of any offer, . . . or for any other reason whatsoever, without notice." (Conf. Agrmt. ¶ 8.)   Balanced against this explicit agreement, Kirkland's testimony regarding a single ambiguous phrase in an internal email communication is hardly significant.[5]  Indeed, Plaintiff does not address the language of the Confidentiality Agreement, or the subsequent letter sent to Plaintiff by Eastdil, on behalf of Defendants, reiterating Conseco's reservation of its "right, in its sole and absolute discretion, to accept or reject any offer for any reason," and stating that factors to be considered in choosing a purchaser would include "price, timing (to complete due diligence, and to close), level of due diligence complete to date, closing capacity, and credibility and earnest money deposit." (Eastdil Letter, Ex. J to Haywood Decl.)

In addition, Plaintiff has not established that testimony by Kirkland about this document would be adverse to Defendants' interests.  As an initial matter, Plaintiff simply speculates that

---

[5] Moreover, since Eastdil — not Kirkland — was in charge of marketing the sale, it is Eastdil's testimony on the subject that would be most useful in establishing what representations were made to potential bidders.

the term "informal auction process," as used in the email, meant something other than what Defendants contend actually occurred. Moreover, the statements made by Kirkland in the bankruptcy proceeding — that none of the documents relating to the sale used the word "auction" — are understood by Defendants, Kirkland's client, to be consistent with their own position: "Taken in context, [Kirkland attorney] Mr. Oslan's statements to the Delaware Court, are simply a restatement of the argument that Conseco and Kirkland have been making all along: none of the documents directed to Plaintiff regarding the sales process used the term 'auction' . . . ." (Declaration of Charles H. Cremens, dated Apr. 23, 2007 ("Cremens Decl."), Ex. B to Haywood Decl., ¶ 11.)  Again, an ambiguous phrase in a single Kirkland document that is not clearly contradictory, and that was not sent to Plaintiff, is not "sufficiently adverse to the factual assertions or account of events offered on behalf of the client" so as to warrant disqualification, especially where both Kirkland and Defendants take the same position with regard to the matter. <u>Occidental Homes</u>, 440 F. Supp. 2d at 314.[6]

      B.   <u>Defendants' Representations that there was No Plan to Use a Stalking Horse Bidder</u>

---

[6] In addition, Kirkland has represented that the Kirkland attorney who drafted the email is no longer employed by the firm. (<u>See</u> Def. Mem., at 17.)  Thus, any questions Plaintiff has regarding the origination of the email and its meaning could be directed to the drafting attorney directly, and would provide no basis for disqualifying Defendants' current litigation counsel.

Plaintiff argues that the testimony of Kirkland is also necessary because Defendants' position that there was no plan to use a "stalking horse bidder" is undermined by a March 13, 2003 document, sent by Eastdil to a Kirkland attorney, which contained a timeline for the sale of the Building (based on a prior discussion) that included the selection of a "stalking horse bidder." (See Eastdil Email, dated Mar. 13, 2003, Ex. B to Koral Decl.)   As a basis for disqualification, this argument is meritless.

As an initial matter, Eastdil's letter to Kirkland referring to a stalking horse bidder was sent in March 2003, at the time when Defendants were initially intending to sell the Building through a Section 363 sale, as part of their proceeding before the bankruptcy court and in resolution of their dispute with Trump.   Indeed, Kirkland concedes that Defendants' initial application for authorization to sell the Building through a section 363 sale in the bankruptcy court specifically requested that the "Court grant Conseco the authority to enter into a contract with a 'stalking horse' bidder . . . ." (Def. Mem., at 20.)   In June 2003, Defendants settled with Trump and the sale of the Building thereafter occurred outside of the bankruptcy process.   Plaintiff, in fact, concedes this. (See, e.g., Pl. Mem., at 7 ("Ultimately, Conseco withdrew its application for a Section 363 sale.").)   Thus, evidence of a communication between Kirkland and Eastdil, regarding

16

the potential conditions of a Section 363 sale that was later abandoned, are utterly irrelevant here.  Even assuming it were relevant, Plaintiff cannot establish that Kirkland's testimony about this document, or the related conversation, is necessary, since Plaintiff could obtain testimony from the Eastdil employees who sent the document.

Nor has Plaintiff established that Kirkland's testimony would be prejudicial to Defendants.  As discussed above, the document to which Plaintiff cites is inapposite.  As such, there are no conflicting statements creating the potential that Kirkland's testimony "would or might be prejudicial to" Defendants. 22 NYCRR § 1200.21(b).  Rather, "[t]he position of Conseco is the same as that of Kirkland -- Conseco did not unwittingly employ Solow or any bidder as a stalking horse for the sale of the GM Building." (Def. Mem., at 21.)  Suffice it to say, Plaintiff has not, and cannot, establish that this issue warrants disqualification.

C.   Defendants' Representations that the Building was Sold Outside the Bankruptcy Process

Plaintiff also argues that it would seek the testimony of Kirkland & Ellis regarding contradictory statements it has made as to whether or not the Building was sold subject to the bankruptcy proceeding.  Specifically, Plaintiff argues that while Defendants argue here that the sale of the Building was not a bankruptcy sale, during the bankruptcy proceeding, in September 2003, Kirkland filed a Reorganization Plan in which it stated on behalf of its

17

client that "because sale of the GM Building . . . is being
conducted pursuant to this Plan, any instrument of transfer that
would effect transfer of the GM Building . . . may not be taxed
under any law imposing a stamp tax or similar tax." (Pl. Mem., at
8; Sixth Amended Joint Plan of Reorganization Pursuant to Chapter
11 of the United States Bankruptcy Code, filed Sept. 9, 2003, Ex.
V to Koral Decl., at 54-55.)   Plaintiff contends that, because
Defendants' argument here, as represented by its counsel, is
contradicted by the statement in the 2003 bankruptcy proceeding, it
is necessary to probe the subject by obtaining the testimony of
Kirkland & Ellis as to whether the sale of the Building occurred
outside the context of the bankruptcy proceeding.   This claim is
meritless.

    Plaintiff concedes that the sale of the Building did not occur
under the bankruptcy plan. (See Pl. Mem., at 3, 7 (stating that
Conseco "withdrew its application to conduct a Section 363 sale,"
and "represented to all interested parties that it would conduct
its own auction of the Building . . .").)   Where both Plaintiff and
Defendant agree that the sale did not occur subject to the
bankruptcy plan, there can be little value in probing Kirkland
about a statement it made, on behalf of its client, potentially to
the contrary.   Moreover, not only is a statement made in the
context of a bankruptcy proceeding — not the subject of this
litigation — irrelevant; the testimony of counsel in that matter

cannot be considered necessary to these proceedings.

At most, Plaintiff could argue that the fact that Defendants were making certain representations to the bankruptcy court supports the argument that they were making similar representations to potential bidders, such that Plaintiff was under the impression (at the time) that the sale of the Building would either occur as a bankruptcy sale, or under circumstances similar to those that would have occurred had it remained a bankruptcy sale.  If Plaintiff intends to make such an argument, he is free to do so, and the Reorganization Plan itself would be the best evidence in support of that argument.  The document does not, however, compel the testimony of Kirkland & Ellis.  Moreover, testimony from Eastdil, Defendants, other potential bidders, and Plaintiff himself is available, and more probative, as to whether Defendants were leading potential bidders to believe that the non-bankruptcy sale would be conducted in similar fashion to a Section 363 sale. Regardless, based on the current posture and existing facts, the relationship between the document filed in the bankruptcy court and the eventual non-bankruptcy sale is far too attenuated to establish necessity.

Finally, even if Kirkland's statement made in the bankruptcy proceeding, on behalf of its client, could be considered material to the matters at issue here, it is not clear that Kirkland's position is adverse to that of its client.  In its response to the

instant motion, Kirkland states, and Conseco agrees, that "Kirkland and Defendants have the exact same position on this matter -- the sale of the GM Building did not occur under the jurisdiction of the bankruptcy court pursuant to a § 363 sale, and the bankruptcy court proceedings are irrelevant to the sales process in which Solow participated." (Def. Mem., at 15; Cremens Decl. ¶¶ 8, 10.)[7]  As such, Plaintiff has not met his burden, and disqualification is not warranted on this basis.

D.   <u>Agreement Requiring Defendants to Retain Kirkland in Future Litigation Regarding the Sale of the GM Building</u>

Finally, Plaintiff argues that Defendants' escrow and indemnity agreement with a title insurance company, in which Defendants agree to indemnify the insurer against any losses or expenses related to litigation with Plaintiff over the sale of the GM Building, warrants disqualification.  Plaintiff states that it would seek testimony from Kirkland regarding a "highly unusual provision" of the agreement, which states that Kirkland would represent Defendants in future litigation involving Plaintiff, because the provision "on its face appears to be a conflict of

_____

[7] Plaintiff also argues that it seeks Kirkland's testimony to demonstrate that it "represented to the Bankruptcy Court that the sale was being conduct [sic] pursuant to the Plan even though it knew Defendants were making or going to make contrary representations to the Delaware Chancery Court." (Pl. Mem., at 16.)  Other than as an attempt to impugn the credibility of Kirkland and the firm's attorneys, the Court does not understand how, even if true, this creates a conflict of interest between Kirkland and Defendants in this case.  In fact, the only relevant evidence in the record suggests that no such conflict exists.

interest," and "appears to have been used by Kirkland to maintain control of anticipated future litigation . . . ." (Pl. Mem., at 17.)  Defendants respond that this matter is irrelevant to the substantive claims in this case and to the instant motion for disqualification, and, in any event, that Defendants freely chose Kirkland to serve as their counsel in future litigation. (See Def. Mem., at 21-22.)  Again, the Court finds Plaintiff's argument meritless.

First, Plaintiff cannot meet his burden in establishing that Kirkland's testimony on this subject is necessary.  The cited provision is part of an agreement between Defendants and an entity not a party to this litigation, and involving a transaction wholly separate from the sale of the GM Building.  Kirkland's testimony on the terms of that agreement is simply not relevant here.  Moreover, even if it were relevant, Plaintiff could obtain testimony directly from Defendants on the circumstances surrounding their selection of Kirkland as counsel in future litigation regarding the sale of the Building.

In addition, there is no evidence to suggest that there is a substantial likelihood that Kirkland's testimony on the subject would be adverse to Defendants.  To the contrary, Kirkland and Defendants both argue that "Conseco freely chose to insert Kirkland & Ellis [] as its counsel of choice in any future litigation." (Cremens Decl. ¶ 13.)

Defendants' indemnity agreement naming Kirkland as its counsel of choice provides absolutely no basis for disqualification.

*          *          *

In sum, the arguments raised by Plaintiff, individually and cumulatively, fail to establish that the testimony of Kirkland and Ellis is necessary to the instant proceeding.  Moreover, at this stage of the litigation, without having conducted depositions to address any of these matters, Plaintiff has not shown that there is any reason to believe, let alone a substantial likelihood, that Kirkland's testimony will be adverse to its client, and therefore prejudicial.  Accordingly, Plaintiff's motion for disqualification is denied.[8]

---

[8] Defendants note that the American Bar Association's ("ABA") advocate-witness rule does not require disqualification of an entire firm because certain lawyers from that firm may ultimately be called to testify at trial, and they further note that courts in the Southern District have held that disqualification of an entire firm is not necessary when an individual attorney is disqualified under the New York Code's Disciplinary Rules. (See Def. Mem., at 10.)  Having concluded that Plaintiff has failed to establish that individual Kirkland attorneys should be disqualified, the Court need not address whether disqualification of the entire firm is warranted. However, were Plaintiff to later renew his motion for disqualification, based on actual evidence obtained during the course of discovery that actually establishes that Kirkland's testimony in this matter would be both necessary and substantially likely to be adverse to Defendants, the Court notes that Plaintiff would have to explain why the disqualification of the entire firm of Kirkland & Ellis was warranted (as opposed to individual attorneys).

Similarly, at this time, the Court need not address Defendants' argument that the ABA rules allow for an attorney who anticipates having to testify at trial to continue to represent a party during discovery and other pre-trial proceedings. (See Def.

III. <u>Sanctions</u>

Defendants, arguing that Plaintiff's motion is frivolous, request that the Court award sanctions against Plaintiff in the amount of Defendants' reasonable attorneys' fees incurred in defending this motion. (<u>See</u> Def. Mem., at 22-23.)  While the Court finds Plaintiff's motion for disqualification to be wholly unpersuasive, sanctions will not be awarded at this time.

First, Defendants have not moved under Rule 11 of the Federal Rules of Civil Procedure.   And, because they have requested sanctions against Plaintiff, not Plaintiff's counsel, (<u>see</u> Def. Mem., at 23), sanctions are not available under 28 U.S.C. § 1927. <u>See</u> 28 U.S.C. § 1927 ("Any *attorney* . . . who so multiplies the proceedings in any case unreasonable and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." (emphasis added)); <u>see, e.g.</u>, <u>State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada</u>, 374 F.3d 158, 180 (2d Cir. 2004); <u>Revson v. Cinque & Cinque, P.C.</u>, 221 F.3d 71, 79 (2d Cir. 2000).

Finally, while courts have the inherent power to sanction parties as necessary to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases," <u>Revson</u>, 221 F.3d at 78 (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43, 111 S. Ct.

Mem., at 11.)

2123 (1991)), "[a]n award of sanctions under the court's inherent power requires both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes . . . ." <u>Revson</u>, 221 F.3d at 78 (internal citations and quotations omitted).  Defendants have not shown clear evidence that Plaintiff pursued this motion in bad faith, and hence the Court declines to sanction Plaintiff in accordance with its inherent authority to do so.

**CONCLUSION**

For the reasons set forth above, Plaintiff's motion to disqualify Kirkland & Ellis as counsel for Defendants is denied, and Defendants' request for sanctions against Plaintiff is also denied.


So Ordered.


_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE


Dated:      June 4, 2007
            New York, New York